# Exhibit 11

JAMS ARBITRATION
Reference No. 5210000275

**Michele Vives, as Receiver of 1inMM Capital, LLC, including re Rogue Black, LLC and Minamata Film, LLC,**
     **Claimant,**

v.

**Iervolino & Lady Bacardi Entertainment S.P.A. and Orion Releasing, LLC,**
     **Respondents.**

_____

## FINAL AWARD

**Date of Final Award:**   March 15, 2024

**Place of Arbitration:**   Los Angeles, California

**Counsel:**

Counsel for Claimant:
David Halberstadter, Esq.
Amelia E. Bruckner, Esq.
Katten Muchin Rosenman LLP
2029 Century Park East, Ste. 2600
Los Angeles, CA   90067
Tel: (310) 788-4400
David.halberstadter@katten.com
Amelia.bruckner@katten.com

Counsel for Respondent Orion Releasing, LLC:
Martin D. Katz, Esq.
Jay Ramsey, Esq.
Sheppard Mullin Richter & Hampton
1901 Avenue of the Stars, Ste. 1600
Los Angeles, CA   90067
Tel: (310) 228-3700
mkatz@sheppardmullin.com
jramsey@sheppardmullin.com

1

Counsel for Respondent Iervolino & Lady Bacardi Entertainment S.P.A.:
Kevin Kroll, Esq.
John D. Fowler, Esq.
Kibler Fowler & Cave LLP
315 S. Beverly Dr., Ste. 320
Beverly Hills, CA    90212
Tel: (323) 205-6462
jfowler@kfc.law
kkroll@kfc.law

**Arbitrator:**

Judge Terry Friedman (Ret.)
JAMS
555 W. Fifth St., 32nd Fl.
Los Angeles, CA    90013
Tel: (213) 620-1133
Fax: (213) 620-0100
tfriedman@jamsadr.com

      This matter came to arbitration pursuant to Paragraph 9 of Schedule 1 of an Acquisition Agreement (the "Agreement"), made and entered July 6, 2020 and executed January 19, 2021 on behalf of Claimant by Andrew Levitas, as Managing Member of Minamata and Rogue Black, and executed on January 21, 2021 by Lesley Freeman, Chief Legal Officer for Respondent Orion Releasing LLC ("Orion").   The Agreement contains an arbitration provision that governs this action.   The provision provides that "[t]he parties hereto agree that any and all disputes or controversies of any nature arising at any time under this Agreement shall be resolved by binding arbitration in accordance with the procedures set forth in this paragraph and be initiated and conducted according to JAMS Comprehensive Arbitration Rules and Procedures ("JAMS Rules")."   The undersigned Arbitrator was appointed pursuant to the process set forth in Paragraph 9.1.   Claimant, Orion and Respondent Iervolino & Lady Bacardi Entertainment S.P.A. ("ILBE") entered Amendment No. 1 (Minamata) ("Amendment") to the Agreement as of November 30, 2021, by which, among other things, ILBE assumed all of Orion's obligations under the Agreement, including to arbitrate all disputes or controversies of any nature arising under the Agreement.

      Having read and considered the submissions, documentary and testimonial proof, arguments and allegations of the Parties, the undersigned Arbitrator finds and concludes, and issues this Final Award, as follows:

### I.    PARTIES AND RELEVANT PROCEDURAL HISTORY

      This arbitration concerns a motion picture entitled *Minamata* (also, the "Film").

      Claimant Michele Vives is a Receiver appointed by the United States federal court over an entity named 1inMM Capital, LLC ("1inMM"), including 1inMM's assets invested in Rogue Black, LLC

and Minamata Film, LLC.

Respondent Orion Releasing, LLC ("Orion") is a motion picture production and distribution company.

Respondent Iervolino & Lady Bacardi Entertainment S.P.A. ("ILBE") is an Italian company that distributes and produces independent motion pictures globally.

Two Scheduling Orders ("SO") were issued, establishing procedures for this arbitration: SO No. 1 (July 19, 2023) and SO No. 2 (February 7, 2024).

The plenary arbitration hearing ("Hearing") was conducted videographically by Zoom on February 6-7, 2024.   Teckla Clay-Pratt, CSR No. 13125, transcribed the Hearing.

Exhibits ("Exhs.") 1-3, 12, 15, 23, 27-28, 31, 36, 39-43, 50, 62-63, 67, 80, 84-87, 97-98, 100-102, 106-108, 114, 117-118, 120-121, 123, 127, 130, 147, 153 were offered at the Hearing and admitted into evidence without objection.   Exhs. 23, 30, 33-35, 37-38 appeared on the Parties' Joint Exhibit List without objection but were not offered at the Hearing.   The Arbitrator admitted them into evidence because they were referred to individually in Claimant's Prehearing Brief.   Four percipient witnesses testified on direct and cross-examination:   Claimant's witnesses Jonathan Gardner, Ray Reyes and Michelle Vives, and Respondent Orion's witness Sam Wollman.   ILBE offered no witness or exhibit.   At the conclusion of the witnesses' testimony, the Parties' stated they had no further witnesses to call or exhibits to offer.   Claimant, Orion and ILBE rested.   The Arbitrator then closed the evidentiary portion of the Hearing.   Counsel for the Parties agreed to deliver closing arguments on February 13, 2024 and to file closing briefs on February 27, 2024.

## II.   FACTS

The following is a presentation of those facts found by the Arbitrator to be true and material to the Award.   Facts not pertinent or material to the Award are omitted.   Citations to Exhibits are noted where the factual findings are based solely or primarily on documentary evidence.   In preparing this summary of facts, the Arbitrator considered all testimony and admitted documentary evidence.   To the extent that this recitation differs from a Party's position, that is the result of the Arbitrator's determinations as to credibility, relevance, burden of proof, and the weighing of the evidence, both oral and written.

### A.   LEGAL BACKGROUND

The United States Securities and Exchange Commission ("SEC") filed a civil action against Zachary J. Horwitz and 1inMM on April 5, 2021, alleging that Horwitz and 1inMM violated federal securities laws by engaging in a Ponzi scheme by which Horowitz persuaded individuals to invest in 1inMM's acquisition and licensing of distribution rights in motion pictures. Exh. 39, 2:4-18.   Instead, according to the SEC's Complaint, Horwitz misappropriated the investors' funds for his personal use. *Id.*, 2:19-3:18.

3

### B. THE PARTIES

On January 1, 2022, the United States District Court for the Central District of California granted the SEC's motion to appoint Michele Vives, as Receiver of 1inMM, including in regards to Rogue Black, LLC and Minamata Film, LLC. Exhs. 40, 41. The Court declared and ordered that, as Receiver for 1inMM, Vives had the power and authority to pursue monetary claims on behalf of Rogue Black, LLC ("Rogue") and Minamata Film, LLC ("Minamata"). Exh. 42. Rogue is an entity through which Horwitz invested 1inMM's funds to produce independent films. Rogue holds a 99% ownership interest in Minamata, which is a special purpose holding entity that owned and controlled the worldwide distribution rights to a motion picture entitled *Minamata* (the "Film"). Andrew Levitas wrote and directed the Film.

At the time it entered the Agreement, Orion was a subsidiary of MGM Studios ("MGM"), and now is a subsidiary of Amazon Pictures, which acquired MGM. Orion has developed, produced and distributed films since 1978, including *Minamata*. Sam Wollman is the head of international distribution for Amazon MGM Studios.

Andrea Iervolino and Lady Monika Bacardi, an heiress to the Bacardi rum family, are the principals behind ILBE.

### B. THE FILM *MINAMATA*

*Minamata* tells the story of a photographer who travels to Japan to chronicle the devastating impact of mercury poisoning on a Japanese coastal village. The actor Johnny Depp portrayed the photographer.

### C. ACQUISITION AGREEMENT

Rogue and Minamata, as Licensor, reached agreement with Orion on July 6, 2020 to grant Orion certain rights in the Film. Exh. 62. The agreed-to version set the U.S. theatrical release date to be no later than June 30, 2021. Exh. 63. Over the next four months, Licensor's attorney Jonathan Gardner and his associate Carissa Knol, Licensor's agent, Creative Artists Agency ("CAA") and Levitas negotiated the terms of the agreement with Wollman on behalf of Orion. Exhs. 64-83. The Film's international distributor, Hanway Films ("Hanway"), also participated in the negotiations. *Id.* During the these negotiations, every version of the agreement retained the June 30, 2021 release date. *Id.* Levitas executed the Agreement on October 29, 2020 as the Managing Member of Rogue and Minamata. Hanway's Head of Business & Legal Affairs, Justin Kelly, also executed the Agreement on October 29th. *Id.* Wollman did not execute that version.

Wollman informed Licensor's and Hanway's counsel on November 11, 2020 that, further to his conversations with CAA and Levitas, he was sending a revised draft of the agreement, that among other things, adjusted the outside U.S. release date from June 30, 2021 to June 30, 2022. Exh. 87. Gardner testified that Levitas wanted the Film released before December 31, 2021 in order to be Oscar-eligible in 2022. The final version of the Acquisition Agreement, which set the outside release date on June 30, 2022, was executed on January 19, 2021 by Levitas for Licensor, on January 21, 2021

4

by Kelly for Hanway and also on January 21st by Orion Chief Legal Officer Lesley Freeman. Exh. 97. The Agreement retained the July 6, 2020 "as of" date. *Id.*

In summary, these are the provisions of the Agreement pertinent to this arbitration:

2. <u>Territory</u>:
   a) Domestic: United States, including its territories and possessions, and Canada
   b) International
3. <u>Rights Granted to Orion by Licensor</u>:   Exclusive rights to license, exhibit, distribute, sublicense and otherwise exploit the Film by means of all distribution rights with the exception of certain limited reserved rights
6. <u>U.S. Theatrical Release Commitment</u>:   Orion shall release the Film day and date in the U.S. Territory on a minimum 10 screens no later than June 30, 2022.   However, if commercial theater chains are closed due to government orders within 60 days prior to the planned U.S. release date, Orion shall have the right, but not the obligation, either to (i) extend the release date to December 31, 2022 or (ii) release it directly to any medium other than theatrical on or before June 30, 2022.
7A. <u>Domestic Minimum Guarantee</u>:
   a) As an advance against the Licensor's domestic participation, Licensor shall be entitled to receive a domestic minimum guarantee of $1,500,000.
   c) 100% of the domestic minimum guarantee shall be paid to Licensor within 15 business days of the latest of (i) execution of the Agreement, (ii) complete delivery to Orion of all delivery items, as defined, (iii) Orion's receipt of an invoice for payment and (iv) Orion's initial exploitation of the Film in the Domestic territory, which shall occur no later than June 30, 2022.
   d) Notwithstanding the above, Licensor shall provide an invoice to Orion listing the correct amount due when the Domestic Minimum Guarantee becomes due and payable to Licensor.   Orion shall not be obligated to pay any portion of the Domestic Minimum Guarantee for which it does not receive the invoice.

Schedule 1.
5. <u>Assignment</u>:   "Orion may grant, assign, sublicense, hypothecate or pledge this Agreement or any of its rights, interests or obligations herein to any third party and this Agreement shall be binding upon and shall inure to the benefit of Orion, its successors and assigns; provided that Orion shall remain secondarily liable for its obligations hereunder unless such assignment is to (a) a parent, subsidiary or affiliated entity of Orion, (b) a company that acquires all or substantially all of Orion's assets, (c) a company into which Orion is merged or consolidated, and/or (d) a "major," "mini-major," "major independent" studio, television distributor, national broadcast or cable television network or similarly financially responsible company or person.
Exh. 1

Gardner testified that Paragraph 5 of Schedule 1 was a standard Orion provision that is found in almost all studio agreements.

### D. JOHNNY DEPP

*Deadline*, a widely-read entertainment industry online publication, reported on October 30, 2020 that MGM had acquired the Film. Exh. 85.   Three days later, *Deadline* published a story that a court in the United Kingdom had found that the tabloid *The Sun* was justified in using the phrase "wife beater" in reference to the Film's lead actor, Johnny Depp. Exh. 86.   In ruling against Depp's libel case, the court concluded that Depp had assaulted his ex-wife Amber Heard. *Id.*

### E. ALTERNATIVE FINANCING

Gardner recounted that he understood from conversations with Wollman that, as a result of the negative publicity about Depp, Orion no longer was interested in releasing the Film theatrically, or at all.   According to Gardner, Wollman expressed that "the lion (MGM's motion picture logo) would never roar on *Minamata*."   Garner confirmed that Levitas was furious about that.

As a consequence of Orion's desire to disassociate itself from the Film and the growing hostility between Orion and Licensor, the parties began to explore alternative financing and distribution options during the first half of 2021.   Orion wanted out while Levitas pressed for a domestic release before the end of the year.   Wollman was instructed by senior Orion executives to explore a sub-distribution arrangement that would de-link the Film publicly from Depp.   He contacted an executive at Vertical, a large independent distributor.   CAA made efforts, too.

By February 2021, Licensor and Orion were exchanging drafts of an interparty agreement and an amendment to the Agreement.   The main points were Levitas' priority to move the domestic theatrical release date to December 31, 2021, and Orion's insistence that it be disassociated from the Film domestically, which meant among other things, that its logo would not appear in the Film.   The parties exchanged many versions of a proposed interparty agreement and amendment. Exhs. 98-112

Wollman grew increasingly frustrated that no solution had solidified.   On June 22, 2021 he informed Levitas that "in the absence of an agreement on a clear path forward for release this year, we'll plan to move ahead with releasing the Film next June." Exh. 120.   On July 26, 2021, *Deadline* reported on and published in full a complaint letter Levitas sent to MGM and to two of the Film's backers to protest what Levitas claimed was MGM's decision to "bury" the Film because of Depp's "personal baggage." Exh. 121.   Wollman blamed Levitas for leaking the story.

Eventually after unproductive discussions between the parties to find alternative financing and their escalating hostility, Jack Wingham of Range Media Partners, connected Wollman with Andrea Iervolino. Exh.3.   Rather than acting as a sub-distributor, Iervolino was interested in taking Orion's place as the domestic distributor, but leaving international distribution with Orion.

### F. AMENDMENT #1

On November 30, 2021, Licensors reached agreement with Orion and ILBE to adopt Amendment #1 to the Agreement.   Iervolino executed it for ILBE, the Distributor, Levitas executed for Minamata and Rogue, and Freeman executed for Orion.

Amendment #1 provided, in pertinent part:

1. <u>Distributor's Assumption of Obligations</u>. Notwithstanding anything to the contrary in the Agreement, the parties acknowledge and agree that Distributor shall assume all of Orion's obligations to Licensor with respect to the distribution of the Picture in the U.S. and Canada (the "Obligations"). Distributor's assumption of Orion's Obligations shall include, without limitation, all Rights (as defined in Paragraph 3 of the Agreement) previously granted to Orion, the obligation to release the Picture in the U.S., and the obligation to pay Licensor a Minimum Guarantee of US $1,500,000 in consideration for all Rights in the U.S. and Canada.

   In lieu of the theatrical release terms set forth in Paragraph 6 of the Agreement, Distributor's theatrical release obligations shall be limited to an Oscar qualifying release, the terms of which shall be subject to Licensor's approval. Orion's obligations with respect to the International Territory (as defined in Paragraph 2 of the Agreement) shall remain in place and, for the avoidance of doubt, Distributor shall not have any obligation to the Picture in the International Territory.

2. <u>Credits</u>. Notwithstanding anything to the contrary in the Agreement, Orion shall not receive logo or billing block credits of any kind in connection with Distributor's exploitation of the Picture. For the avoidance of doubt, Distributor shall not exploit the Picture or any related assets with any Orion logos or credits.

3. <u>Orion Support Minimum Guarantee</u>. In support of Distributor's assumption of the Obligations, Orion shall pay to Distributor an amount equal to US$500,000 (the "Support MG"). Orion shall pay Distributor the Support MG upon signature of this Amendment by Distributor, Licensor, and Orion.

9. <u>Miscellaneous</u>. For clarity, Orion shall have no obligations to Licensor and Distributor (including, without limitation, representations and warranties and Key Deliverables) with respect to the Picture in the US and Canada other than as expressly set forth herein.

   (un-numbered paragraph) "In the event of an inconsistency between the Agreement and this Amendment, this Amendment shall govern."
   Exh. 2.

Amendment No. 1 contains no language concerning Orion's secondary liability. Gardner testified that in his discussions and negotiations with Wellman about Amendment No. 1 they had no communication regarding whether Amendment No. 1 impacted Orion's secondary liability. Wellman testified that he had no recollection of any such communication.

### G. NON-PAYMENT OF DOMESTIC MINIMUM GUARANTEE

ILBE issued Orion a Direction to Pay to pay its $500,000 Support Minimum Guarantee pursuant to Amendment #1 directly to Rogue. Exh. 37. Ray Reyes, as counsel for Vives, served a

Notice of Default on ILBE on September 13, 2022 regarding ILBE's failure to pay its $1 million Domestic Minimum Guarantee to Licensor no later than October 11, 2022. Exh. 36.    ILBE did not timely pay the $1 million, nor has it or Orion paid it as of the date of the Hearing.

### III.    **APPLICABLE LAW**

Paragraph 18 of the Acquisition Agreement states that it shall be construed and interpreted pursuant to the law of California as it applies to contracts entered into and performed wholly within California without regard to any conflicts-of-laws principles. ¶5, SO No. 1.    JAMS Rules also apply.

This section cites only the applicable statutory and common law that is necessary for determination of disputed issues.    Some cases and statutes may be cited to confirm that the Arbitrator read and considered them before deciding they do not apply.    Relevant law that was not dispositive is omitted.

It is axiomatic that the parties to an agreement may modify it. *Vella v. Hudgins* (1984) 151 Cal. App. 3d 515, 519.    As a general rule, an original contracting party who assigns its rights and obligations to another remains secondarily liable to the original contracting party if the assignee thereafter breaches the contract. *Wiseman v. Sklar* (1930) 104 CA 369, 374.

A contract may be explained by reference to the circumstances under which it is made. Civil Code §1647; Code of Civil Procedure §1860; *Pacific Gas & Electric Co. v. G.W. Thomas Drayage & Rigging Co.* (1968) 69 C2d 33, 38.    Specially crafted language controls over form language. CC §1651. Where provisions in related contracts conflict, courts give priority to the contract that specifically states what controls as between two expressly referenced inconsistent provisions. *SumoText Corp. v. Zoove, Inc.*, 2016 WL 1642647, at *4-5 (N.D. Cal. Apr. 26, 2016).

The contract construction principle of *ejusdem generis* establishes that where specific words follow general words in a contract, the general words are construed to embrace only things similar to those enumerated by the specific words. 1 Witkin, Summary 11th Contracts, § 764 (2023); *California Farm Bureau Federation v. California Wildlife Conservation Board* (2006) 143 CA4th 173, 189.    The principle "applies whether the specific words follow general words in a [contract] or vice versa. In either event, the general term or category is restricted to those things that are similar to those which are enumerated specifically." *International Federation Of Professional & Technical Engineers, Local 21, AFL-CIO v. Superior Court* (2007) 42 CA4th 319, 342.    The rationale for application of the principle "is based on the obvious reason that if the [writer] had intended the general words to be used in their unrestricted sense, [he or she] would not have mentioned the particular things or classes of things which would in that event become mere surplusage." *Harris v. Capital Growth Investors XIV* (1991) 52 C3d 1142, 1159.

"The burden of an obligation may be transferred with the consent of the party entitled to its benefit, but not otherwise. " CC §1457.    Courts interpret this provision liberally to require the assignor of a contract to fulfill its contractual obligations, including in the event of the assignee's default. *Baer v. Associated Life Insurance Co.* (1988) 202 CA3d 117, 123.    CC §1457 does not mean an

assignee cannot assume contractual obligations, but simply that "the assignor is not . . . relieved of them." *Hearn Pacific Corp. v. Second Generation Roofing, Inc.* (2016) 247 CA4th 117, 149 – assignor remains bound as a surety under the contract absent the counter-party's consent to the assignment.

It is essential to the assignment of a right that the assignor manifest an intention to transfer the right. *Sunburst Bank v. Executive Life Insurance Co.* (1994) 24 CA4th 1156, 1164.   The substance, not the form of the transaction controls whether an assignment is intended. *McCown v. Spencer* (1970) 8 CA3d 216, 225    "A party may perform his or her duty through a delegate . . . No delegation of performance relieves the party delegating of any duty to perform or any liability for breach." Commercial Code §2210(1).

"Novation is the substitution of a new obligation for an existing one." CC §1530; *Wells Fargo Bank v. Bank of America* (1995) 32 CA4th 424, 431.    "The intention of the parties to extinguish the prior obligation and to substitute a new agreement in its place must clearly appear." *Fanucci & Limi Farms v. United Agri Products*, 414 F.3d 1075, 1081 (9th Cir. 2005).    The party asserting novation must plead its existence expressly or by unequivocal implication and bears the burden to establish its existence. *Colley v. Chowchilla National Bank* (1927) 200 C. 760, 770.    Evidence in support of a novation must be clear and convincing. *Alexander v. Angel* (1951) 37 C2d 856, 860. Determining the parties' intent is a highly fact-specific inquiry. *Fanucci, supra.,* at 1082.    Novation can be a bilateral or multilateral contract, but in either case all parties must mutually assent to the new obligation. *Ayoob v. Ayoob* (1946) 74 CA2d 236, 251.    The obligee's intent controls on the question whether the original obligation is waived or released. *Id.*    An essential element of a novation is that it "clearly appear" that the parties intended to extinguish rather than merely modify the original agreement. *Howard v. County of Amador* (1990) 220 CA3d 962, 977.

A waiver is an intentional relinquishment of a known right or conduct "so inconsistent with an intent to enforce the right as to induce a reasonable belief that such right has been relinquished." *Savaglio v. Wal-Mart Stores, Inc.* (2007) 149 CA4th 588, 598.

A JAMS Award may allocate arbitration fees and arbitrator compensation unless such an allocation is expressly prohibited by the parties' agreement. JAMS Rule 24(f).

## IV.     PLEADINGS

Claimant filed a Demand for Arbitration ("Demand") on January 13, 2023.   The Demand sought $1 million jointly and severally against ILBE and Orion in compensatory damages, pre-judgment and post-award interest, and arbitration costs.

## V.      DISCUSSION

ILBE offered no witness or documentary evidence at the Hearing, nor did its counsel examine any witness or present any argument.    Apparently, ILBE concedes its breach of Amendment No. 1 and its resulting liability for the remaining unpaid $1,000,000 Domestic Minimum Guarantee. Hence, the entire arbitration was contested between Claimant and Orion (hereinafter, the "Parties").

The Parties do not dispute the general rule that an original contracting party who assigns

its rights and obligations to another remains secondarily liable to the other original contracting party if the assignee thereafter breaches the agreement. *See* Orion's Prehearing Brief, 8:25-28 and Claimant's Post-Hearing Brief, 3:5-7, 16-18. They do, however, disagree on whether the general rule applies here.

### A. Summary of Claimants' Position

Claimant's case rests on the Acquisition Agreement holding Orion secondarily liable for its obligations notwithstanding its right to assign its rights. Exh. 1. Claimant considers Amendment No. 1 to be an assignment which maintains Orion's secondary liability. Claimant points to what it considers to be inapplicable narrow circumstances in Paragraph 5 of Schedule 1 to the Acquisition Agreement that allow Orion to escape secondary liability: if Orion assigns its distribution obligations to "a 'major,' 'mini-major,' or 'major independent film studio,'" which it did not. Moreover, according to Claimant, Paragraph 5 applies broadly to "any" transfer of rights, not just assignments, which preserves Orion's secondary liability even if Amendment No. 1 is not deemed an assignment.

Claimant rejects Orion's characterization of Amendment No. 1 as a partial novation, operating to retain Orion's international distribution obligation while replacing Orion with ILBE as the domestic distributor. According to Claimant, there is no such thing as a "partial novation" under California law. In addition, Orion cannot establish a novation by the requisite clear and convincing evidence because no evidence was offered to prove that Rogue Black, the Licensor, expressly or by unequivocal implication, intended Amendment No. 1 to be a novation.

Claimant rejects Orion's view that the release language in Paragraph 9 released Orion's secondary liability because Orion cannot meet its burden to demonstrate that Rogue Black knowingly, intentionally and expressly released Orion.

Lastly, Claimant refers to the contract interpretation principle of *ejusdem generis* to support its understanding that the phrase in Paragraph 9 "no obligations to Licensor" is constrained by the enumerated obligations "representations and warranties" and "Key Deliverables" that follow it. Likewise, Claimant argues that there is no conflict between the release language in Paragraph 9 of Amendment No. 1 and Paragraph 5 of Schedule 1 because the principle of *ejusdem generis* dictates that Paragraph 9 applies only to domestic distribution-related obligations.

### B. Summary of Orion's Position

Orion does not view Amendment No. 1 as an assignment It points to Gardner's testimony that minimized its "assignment aspect" and admitted he did not think of Amendment No. 1 as an assignment at the time of contracting. Even if Amendment No. 1 were to be so construed, Orion believes its terms relieved it of its obligations in the domestic territory, acting as a novation. Against Licensor's counter-argument, Orion asserts that Paragraph 9 operated as a knowing and intentional release and, in any case, constituted a partial novation extinguishing its obligations under the Acquisition Agreement. Orion rejects Licensor's reliance on the principle of *ejusdem generis*, which it contends only applies when general words *follow* enumeration of particular classes of things.

10

### C. <u>Assignment</u>

Orion is correct that the word "assignment" does not appear in Amendment No. 1. Yet a writing may effect an assignment without using the word so long as the assignor manifests an intention to transfer a right. *Sunburst, supra.* The substance of a transaction determines whether an assignment is intended. *McCown, supra.*

Amendment No. 1 plainly delegates all of Orion's domestic distribution obligations to ILBE.

Paragraph 5 in Schedule 1, by its express language, contracts away Orion's secondary liability only if Orion assigns its distribution obligations to a major, major-minor or major independent film studio. Gardner, an experienced lawyer in the entertainment industry, testified that ILBE was not a "major" studio in any of those three ways. No testimony, including by Orion's sole witness Wollman, challenged Gardner's opinion. Additionally, to the extent the Acquisition Agreement made Orion a surety obligated to perform the Minimum Guarantee, Orion failed to proffer evidence that its creditor, the Licensor, clearly and expressly manifested an intention to release Orion's suretyship obligations.

Viewed substantively in light of Paragraph 5, Amendment No. 1 is an assignment.

### D. <u>Transfer of Rights</u>

Even were Amendment No. 1 not an assignment of Orion's rights, Paragraph 5 in Schedule 1 contains broad transfer language: "Orion may grant, assign, sub license, hypothecate or pledge this Agreement or any of its rights, interests or obligations to any third party and this Agreement shall be binding upon and shall inure to the benefit of Orion . . . provided that Orion shall remain secondarily liable for its obligations hereunder . . . " There can be no doubt that this language clearly and expressly holds Orion secondarily liable for the Minimum Guarantee.

### E. <u>Novation</u>

Orion seeks to escape the noose by re-characterizing Amendment No. 1 as a novation or, more precisely, a partial novation. CC §1530 defines novation as "the substitution of a new obligation for an existing one." To make its case for novation, Orion splices the Acquisition Agreement into two separate agreements – international distribution of *Minamata* and domestic distribution. Orion's idea preserves the international portion of the Acquisition Agreement while extinguishing the domestic portion and its provision imposing secondary liability on Orion. Unsurprisingly, Orion cited no express authority for the idea because there is no California case[1] that recognizes such a "partial" novation.

Logically, partial novation makes no sense since the concept of novation depends on the *entire* abrogation or extinguishment of the old agreement. The Acquisition Agreement is a solitary, unitary agreement, not two separate agreements. It would be absurd to view every term of a single

---

[1] The Arbitrator gives no weight to two unpublished California cases cited by Claimant that reject the concept of "partial novation."

11

contract as a separate agreement. How could the rights and duties of parties be governed by a new agreement alone when an old agreement contained numerous terms with only one deemed to be extinguished by the novation?

Finally, and most decisive, Orion failed to produce evidence, let alone clear and convincing evidence, that the Licensor intended Amendment No. 1 to release Orion from its obligation to be secondarily liable for the Minimum Guarantee. *Colley* and *Alexander, supra.* To the contrary, no document related to the Parties' extensive negotiation of Amendment No. 1 discussed the notion of extinguishing Orion's secondary liability. Nor did either Gardner or Wollman, who negotiated it, testify that they discussed an intention to release Orion. Amendment No. 1 is simply not a novation or a partial novation.

### F. <u>Waiver or Release</u>

Orion's last argument is that Paragraph 9 of Amendment No. 1 released it from any secondary liability obligation. That provision reads:

> For clarity, Orion shall have no obligations to Licensor and Distributor (including, without limitation, representations and warranties and Key Deliverables) with respect to the Picture in the US and Canada other than as expressly set forth herein.

In order to establish that this provision constituted a waiver or release of Licensor's right to enforce Orion's secondary liability obligation set forth in the Acquisition Agreement, Orion must establish that Licensor intended or acted in a way that induced Orion to believe it intended to relinquish that right. *Savaglio, supra.* Again, as with its other challenges to the imposition of secondary liability, Orion presented no evidence to meet its burden to prove Licensor's intent to waive or release its right, much less that Licensor expressly stated that intent.

Claimant also takes the position that the contract interpretation principle of *ejusdem generis* confirms that Paragraph 9's general reference to Orion's "obligations to Licensor" must be construed to embrace only things similar to the specific examples that follow, namely, "representations and warranties and Key Deliverables." This construction excludes from the disclaimer Orion's obligation to be secondarily liable. Orion argues that Claimant is mis-applying the *ejusdem generis* principle, which Orion believes arises only when the general words follow, rather than precede enumeration of particular classes of things. To the contrary, courts apply the principle in both sequences. *International Federation, supra.* The rationale for *ejusdem generis* makes sense either way. *Harris, supra.*

Orion then turns to the controlling language in Amendment No. 1 to argue that the conflict between Paragraph 9 of Amendment No. 1 and Paragraph 5 of Schedule 1 must be resolved in favor of Paragraph 9. As Orion sees the inconsistency, Paragraph 9 relieves Orion of all further obligations in the domestic territory while Paragraph 5 makes Orion secondarily liable in the event of certain assignments. However, once Paragraph 9 is understood pursuant to the *ejusdem generis* principle *not* to impact Orion's obligation to assume secondary liability, the two Paragraphs no longer conflict.

### VI. CONCLUSION

The spark that lit the fire in this dispute was the London court finding that Johnny Depp had assaulted his former wife. Orion understandably wanted to disassociate itself from Depp in the domestic marketing and distribution of *Minamata*. That led to the Parties search for a new domestic distributor, Orion's assignment to ILBE and the adoption of Amendment No. 1. Only thereafter did Orion decide to walk away from the secondary liability for the Domestic Minimum Guarantee it assumed in the Acquisition Agreement. Its able counsel struggled to advance theories to evade that liability, but the die had long before been cast when Orion expressly assumed secondary liability in the event of an assignment.

Consistent with the factual findings and conclusions of law set forth above, the undersigned Arbitrator makes these findings and orders:
1. Vives met her burden of proof to establish that ILBE breached Amendment No. 1.
2. Vives met her burden of proof to establish that Orion breached the Acquisition Agreement and Amendment No. 1.
3. ILBE and Orion are jointly and severally liable for Vives' damages.
4. Vives is awarded damages against ILBE and Orion in the amount of $1,000,000.
5. Vives is awarded prejudgment interest on the $1,000,000 damages at the statutory rate of 10% per annum from June 30, 2022, the outside release date of *Minamata*, through the issuance date of this Final Award. This amounts to a daily rate of $273.97 times 624 days, totaling $170,957.28.
6. Vives also is awarded post-award interest at the $273.97 daily rate from issuance of this Final Award until its confirmation to judgment and thereafter from its confirmation to judgment until satisfied in full.
7. The Arbitrator allocates to be paid by ILBE and Orion the $56,554.67 in arbitration fees incurred by Vives on her own account and to cover ILBE's unpaid share, which Vives advanced.
8. Upon issuance of this Final Award, this arbitration is closed.

Dated:   March 15, 2024            /s/ Terry Friedman
                                   Judge Terry Friedman (Ret.)
                                   Arbitrator